Call the next case, which is Stacey Parks Miller v. County of Centre et al. Mr. Castor. I may please the court. My name is Bruce Castor. I represent the appellant, in this case, Centre County District Attorney Stacey Parks Miller. I'd like the court's permission to reserve five minutes for rebuttal. Great. As I was reading the factual recitation in this case, I noticed that there were at least three things that have changed that I'll bring to the court's attention. The first is that we had said that the Supreme Court had granted a petition for allowance of appeal on the right to know issue. That was, in fact, argued, but the decision has not been made. Secondly, Federal District Court Judge Brand granted the appellant's motion to dismiss in the federal case involving Michelle Schutt. That's still within the 30-day period, so we don't know what's going to happen with that. During the briefing, we referred to appellee Bernard Cantorna as Candidate Cantorna. In fact, he was elected on both tickets in the primary. He was the only challenger to District Attorney Parks Miller, and presumably will be elected District Attorney in November. Those are things that have changed since the factual recitation that I laid out when I wrote the brief. Mr. Castor, since so many claims were filed, can I try to whittle them down a little bit? I would love that. Well, that's up to you, which ones you concede. I have my own chart here as to which ones that I think are the easy, maybe we could call them easy affirms. I'm speaking only for myself, not my colleagues. Let's start with Pipe. I didn't really see anything in the briefing on Mr. Pipe. We didn't sue Mr. Pipe personally. We sued him as a member of the Board of Commissioners in Center County. Okay. And then the negligent infliction of emotional distress, is that, for any of the defendants, is that still part of the case on appeal? I don't immediately recall. That claim and the false light claim, I just didn't see anything about those two. I didn't see anything to support that either. My notes don't have it. I wasn't going to plan to argue anything on that. Okay. Well, maybe I should let you. Which claims do you think are the strongest on appeal? Is it shut that mostly you're focused on? No. All of them to some degree. We're here on an appeal from a motion to dismiss a 12B6 motion. Judge Brand quite particularly noted that we had overpled the case. What he did not mention was that it was filed in Pennsylvania court where fact pleading was required and then removed to federal court. But all of the things that we wrote in the factual section, and I have had this issue in every court that I have argued any aspect of this case. It is very hard to believe that this happened. But I believe that in the factual portion of the brief and pled, we think we can prove. And I believe that Judge Brand should have permitted us to take discovery and then we would be arguing before him on a summary judgment claim where I could back up those things. For instance, Mr. Castor, that's fine to say. But if we start through these cases in some order and you go to, let's start right at the top, Judge Lunsford. Was it Judge? Judge West. Judge West. Judge West, not Judge Lunsford. Judge Lunsford was in our last case. It's Center County Day here. Evidently. But Judge West. Wasn't this in her official capacity? Absolutely not. Why is it outside of her official capacity? She's a fact witness. The critical thing to understand as it relates to Judge West is she signed two wiretaps for this case and they were the kind that have to have affidavits and all that stuff because the DA's office was concerned that an appellate court review Ryan Richards' imprisonment as his home. So it carries with it all of the extensive affidavits and all that sort of thing that you're familiar with including the agents coming in and swearing to it. When she tells the detective that she has no knowledge of the Ryan Richards case, that we can test is a lie. And that is a factual lie used to get the search warrant. And that lie is as a result of a meeting that Judge West had with Defendant McGraw ex parte. The question still is, the question in this case which both sides are arguing about, is did Judge West sign this fake bail order? That's the question, right? That's one of the principal questions. Will you agree with that? No. Everybody agrees that she signed it. No. Let me rephrase my question. Isn't her signature one of the principal questions in this case on that fake bail order? No. The principal question in this case, as it relates to Judge West, is did she tell factual untruths to the detective in order to get a search warrant? Well, if she didn't remember signing the fake bail order, and in fact that is her recollection, then that is her recollection then it's not an untruth to tell a detective who asked you a question that you don't remember it. I agree, but that's not the problem. The problem is... Doesn't it go back to the signature on the bail order? No, Your Honor. The factual recitation that what we can test is a lie was when she tells the detective that she doesn't have any knowledge of the Ryan Richards case. I suggest to you that that is a fact question because it is impossible. Listen, we've all been lawyers a long time, a lot of us have been prosecutors a long time. How many times have you had a murderer, convicted murderer, that you're investigating in prison using wiretaps because he's going to take out a contract to murder an assistant DA? You don't forget that. And when she says to the detective, I have no knowledge of the Ryan Richards case, he figures the same thing that I just said. Well, no one could forget that, so therefore she must not have any knowledge, and therefore when she says she doesn't remember who signed the order, it buttresses the credibility of her recollection that she didn't sign the order. But the statement that I know nothing about the Ryan Richards case is a factual statement and it is no different than if she's walking her dog, sees somebody go through a red light and tells a police officer, I saw the guy go through a red light. Because that's a factual issue, and it is impossible that that is true. Well, if she is saying it in her judicial capacity to get the search warrant, doesn't it, it doesn't matter if she's corrupt, if she's malicious, if she's lying, she's saying in her judicial capacity. No, Your Honor, I'm sorry to disagree with you. She is interviewed by the police. The is a factual witness who is approached by a police detective and asked, do you know anything about this Ryan Richards investigation? She says, no. Can you identify this signature? I can't tell if that's mine or not. Okay, isn't that in her judicial capacity, what you just said? She said she doesn't know whether it's her signature. She wasn't signing a check. The issue of whether she can remember signing her name or not, I find that to be hard to believe. That's not the question. We can assume, for purposes of this discussion, we can assume she was lying. Right? I mean, that's the strange thing, perhaps, about judicial immunity. Sadly, from time to time, there is. But that doesn't mean that the court orders they sign and the other things they do in connection with the legal system aren't protected by judicial immunity, does it? We need to understand that I think 15 months have gone by between when she signs this and when she says that I can't recognize it. And I will grant you, for purposes of this argument, Judge Fischer, if you want to rule that that is in her judicial capacity. But when she says she doesn't know about the Ryan Richards case, that can't be in her judicial capacity because what she's telling the police officer is buttressing in the police officer's mind that the district attorney must have done something wrong. Because the police officer is thinking, nobody could forget this. I'm not sure how you can distinguish between the two of them. Let's move to another defense. Ms. Schutt. Okay. You know, Supreme Court, we have to look here at the law as enunciated by the Supreme Court of Pennsylvania. And in fact, in 2015, in Shane v. Addis, they wrote a very helpful opinion. When I say helpful, it's helpful to explain the doctrine of judicial privilege. Jane L. Roth is noted pro se in the caption of that case. I don't know how you get in that pro se. We should have counsel appointed for you. But why isn't, tell us about the judicial privilege and why isn't at least, I think this whole series of communications involving Schutt, not what she did to get to that point, but the whole series of communications seems to start at the affidavit that she signs. And why isn't that, doesn't that fall within the scope of judicial privilege in Pennsylvania? In the Shane case, as you cited, a woman was on vacation, comes back to college for Thanksgiving and she was having an affair. The friend reports that to the authorities and it works its way through the system. Well, the friend was the teacher and had an obligation to report it to the school system that there was an accusation that another teacher had been having an affair with a student. I agree. So what happens, though, is the teacher sues the person who sued the paramour and says that the paramour never intended to make a police report, never was involved in the police action until the friend, the teacher, caused that to happen. And the court ruled, since there was no evidence that the paramour, the visiting back from Thanksgiving girl, had any effort, engaged in any effort or did anything to advance a case, that the suit could go forward, that that was defamatory. In this instance, what happens is, Shutt leaves the district attorney's office. Fifteen months later or so, she tells her new employer that she has this evidence that she says is incriminating to the district attorney. One of the co-defendants, her employer, writes an affidavit. But Shutt, who is the district attorney, writes the affidavit. And Shutt never tells the police. Shutt never takes the affidavit to the police. Shutt never does anything as it relates to trying to advance a criminal prosecution. Mr. Castor, does your complaint, and actually it's the amended complaint that was filed in federal court, does your complaint indicate how that whole conversation came up between the district attorney's office, went to work for somebody else, and ended up with Mr. Massorti's law firm? No, we don't know how that came. We don't know who asked. So there's nothing in the complaint about that? We don't know. We'd have to take discovery to find that out. But what we do know is that there's no effort by Shutt to advance a criminal purpose. And in the case with the lady visiting on Thanksgiving, that she had to have wanted to advance a criminal purpose and done something to do that. But in this instance, it's very difficult for Shutt to argue that because she leaves the DA's office, takes the material, which Judge Brand says is not stealing, because there were 11 law enforcement agents on it. And therefore, if 11 law enforcement agents were on a confidential email, the whole world must be allowed to know about it. I don't understand that ruling, but that's what Judge Brand ruled. Did WikiLeaks know about it? No, not that I know of. So maybe not the whole world. So there's a huge gap in time. So if she really wanted to file a police report, she could have done that at any time, but she never did. It was only when she got employed by an adversary of the District Attorney, who admits his animus to the District Attorney, that they first try to shop it to TV shows and newspapers. That doesn't work out, so they take it into the police. And the police don't want to do it. They want to send it to the state police. But then, according to the grand jury, the commissioners coerced Belfont Police to take it. So you say there's no judicial privilege there. Why? Why is there no judicial privilege? Because the person asserting it never tried to get law enforcement involved. But the record doesn't appear to allege that she asserted it to anyone until she signed that affidavit. And I assume that she signed the affidavit for some litigation purpose. I don't know the answer to that. But what I do know is that Michelle Shutt never showed up at the police department in the state. Nor did she take the affidavit there. How much time ensued from the time she signed that affidavit, which I believe was in January of 15? It was December 30th of 14. 14. How much time elapsed between then and when the Belfont Police began investigating Ms. Parks Miller? Several weeks. But there was no... In the analogy to the university case, the teacher in that case, who's the reporter, is analogous to the new employer here. And it's not that the person who was aggrieved did not do anything to advance the criminal law purpose. And the explanation for why that is and why that happened, we don't know because we didn't get to take discovery. Thank you, Mr. Castro. We'll hear you on rebuttal. First advocate for appellees is Ms. Mayerhofer. Did I pronounce that correctly? Yes, Your Honor. It's Mary Lou Mayerhofer on behalf of Center County, former director of administrative services, Timothy Boyd, former county solicitor, Louis Glantz, former county commissioner, Chris Gargas, commissioner Steve Dersham, and commissioner Michael Pipe. Your Honor, just briefly to go back to your very first question, trying to pare down some of this information, on footnote one of the reply brief, I'm sorry, the original brief, it indicates from SPM or the appellant's brief that they are not going forward with Michael Pipe. When they define the defendants, the county defendants, he is not listed there, Your Honor. So it's our interpretation of that they have not gone forward with Commissioner Pipe. Further, as to the causes of action for negligence or negligent infliction of violence against children of emotional distress, if Your Honor's point your attention to footnote 15 of the reply brief, the appellant indicates that they are not going forward with those two causes of action as well. Additionally, in the original brief that the appellants filed, they did not follow through with their arguments on false light and injurious falsehood. And we have argued that they have waived their positions on those as well. Your Honors, the appellant has had numerous opportunities to amend her pleading in this case. And based upon the allegations that were set forth in the amended complaint, and then the second amended complaint, on the face, both of those documents do not make or set forth any causes of action against any of the Center County defendants. Your Honors, the appellant was given great latitude, not only when they filed the amended complaint, because all of the defendants had filed motions to dismiss. And in fact, the motions were a problem in the complaint. Thereafter, once we filed that and the other defendants filed theirs, we filed our brief and then they filed their amended complaint. We then raised those 20 issues plus two more to argue that the amended complaint was still a moral argument. And in what I believe was a very strenuous discussion with all counsel, if you review the transcript, you will see he asked the appellant's counsel numerous times about all the causes of action and how they were structured and what other information was necessary or might be needed in order to form a cause of action on his face in these cases. Ms. Moorharfer, isn't one of the claims against your clients that you were involved in getting the Bellefonte Police to go and get a search warrant to search the office of the District Attorney? Isn't that one of the claims? That is one of the allegations, Your Honor. All right. Now, you represent a number of parties in this case, and they're all not involved in this case. Is it fair to say, Your Honor, that that was perhaps not the correct way to have this case investigated? Your Honor, there are two things going on. I mean, there is something called the Commonwealth Attorneys Act that attorneys in Pennsylvania, I think, generally know of its existence. And you were dealing with the Chief Law Enforcement Officer in the county? Your Honor, you're looking at two different things there. You're looking at the county code versus the Commonwealth Attorneys Act. And if you look, the statutes for the county code are still valid that allow an investigation. Second of all, assuming at this point, and I'm not saying it's true, but assuming at this point, if any of the commissioners or any of my clients went to the Bellefonte police, then at that point, Your Honor, Well, somebody went to the Bellefonte police. Well, here's what happened, Your Honor. Based upon the facts as alleged by the appellant, if you look at reproduced record page number 280, on January 6th of 2015, the police became aware of the allegations against Stacey Parks Miller. On reproduced record page 295 and 296, on January 16th of 2015, Stacey Parks Miller contacts the Office of the Attorney General and notifies them that there's something going on, and on that date, they agree to take over whatever investigation. When was the search of her office? Her search of the office occurred on January 24th of 2015, again looking at reproduced record 368 and 373. However, Your Honor, I need to backtrack just a bit and state that on January 20th of 2015, Was there probable cause for that search? Yes, according to Judge Brand and everyone else who's reviewed this. Well, tell me what it is. Your Honor, the Bellefonte police had the affidavit walked into their office on January 6th. It just walked in? Well, I believe Attorney Missorti walked it in, Your Honor, from what I understand. Yeah, alright. And they began their investigation. They, the Bellefonte police, an independent agency from the Center County people. What happened next was the detective assigned to it interviewed certain people. That's where you get the allegations against Judge Ruesch. He also obtained documents from the courthouse, which were the campaign finance documents that showed that Stacey Parks Miller was using her district attorney office staff to do campaign related activities. Based on those items, the Michelle Shedd affidavit, and I'm not sure... I thought she was unopposed. Pardon me? I thought she was unopposed for re-election. During that time frame, not this last election, Your Honor. Now, during the time that they... I mean, ask about the probable cause. Right. And the probable cause was she still had to file a financial campaign paperwork. And there was discrepancies or issues related to those. And, in fact, the grand jury found that there was diminuous activity involved in that, but they didn't file any charges or recommend any charges on that. But, regardless, you had all of this information that the detective looked at, put together, and then what happened on January 23, Judge Ruesch, based upon the Supreme Courts of Pennsylvania, and some of Your Honors may be aware, that certain counties share judges, common police court judges, when there are conflicts. And pursuant to a standing order issued every January, Judge Ruesch said, we can't handle this, this has to go to an out-of-county judge. And that document was produced. It's in Reproduce Record A-374. At that point, they provided, the Bellefonte Police provided to the President Judge of Clinton County, not a magistrate judge, but the President Judge of Clinton County, their warrant, and asked if it could be executed. He reviewed it, and I'm sure looking at the fact that it involved a district attorney, he reviewed it very carefully before he executed that document, and then the Bellefonte Police executed the warrants, not only at Stacey Parks Miller's office and the district attorney's office, but also at the county office. And there was probable cause based upon the well-reasoned decision by Judge Brandt. Thank you. Thank you, Ms. Mayerhofer. Mr. Daly, double duty this afternoon on behalf of Judge West, correct? Yes, that's correct. May it please the Court. I'm Michael Daly on behalf of the Honorable Pamela West, and I'm glad Judge Fischer messed up the judges here because that was one of my fears initially. I think I practiced. I saw you sitting there. I think it's Judge Lunford out of St. Laurent in this case too. Yeah, and as the Court's aware, I have three minutes. Your Honor, the district court was correct in holding that judicial immunity does apply in this case because everything related to Judge West flows from the bail order that she signed, which is admittedly by all parties a valid order in her judicial capacity. What about Mr. Castor's argument about the purported lie about the Richard matter? Well, Your Honor, the A, as I think Judge Fischer pointed out, it goes to her judicial act and her judicial function, and she was approached as a judge. And I do think it's a different situation. How do we know she was approached as a judge in respect to that question? With respect to her signature, clearly she was approached as a judge. But what about that issue? I mean, I think it follows, Your Honor, because she's going to be asked about her order that she signed. So the only reason the Richard question was posed was as a precursor to the discussion about the legitimacy of the order. Correct. They came to her about her judicial function that she took about her order. As the Court's certainly aware, the judicial immunity applies to ex parte contacts or communications. Yeah, and I do think it would be different certainly if, you know, let's say if it was a check or something she wrote that wasn't related to the judicial. Mr. Daly, you twice said here the order that she signed. You do represent her. Are you acknowledging that she signed it? No, Your Honor. I'm assuming that for the sake of argument. Okay, that was shorthand. That was shorthand language. Yes, it was, yeah. I saw Mr. Castor writing that down. The counsel said she signed that. Yeah. I'm assuming that for the sake of argument. Just like I think Judge Hardiman was assuming that Judge Ruess was lying at the time for the sake of argument. So I'm doing the same, Your Honor. I have no position on that, Your Honor. But certainly, as Judge Hardiman pointed out, assuming, you know, for judicial immunity purposes, it obviously applies no matter what a judge's motive is. If there was malice, let's say if for some reason a judge did sign an order, lied about signing an order, it's going to be protected by judicial immunity. And there are other protections that a judge could be subject to, or I should say sanctions that a judge could be subject to. For instance, if a judge was lying about an order or something along those lines, certainly the Judicial Conduct Board of Pennsylvania could inquire into that. If a judge was lying to law enforcement, I believe there's a statute about impeding an investigation or providing false information. So it's not like, well, because there's judicial immunity that, you know, if a judge misstates something about an order or does so intentionally, that they could get away with no sanctions at all. And I'd say my time is up. Thank you, Mr. Daly. Thank you, Your Honor. Ms. Urchak, on behalf of Ms. Schutt. Good afternoon. Kathleen Urchak for Michelle Schutt. In listening to Mr. Castor's argument, I want to reframe the shame viatus test that you look to in order to determine whether Ms. Schutt has judicial privilege. The test is not that Ms. Schutt had to be involved and pursue a criminal prosecution. The test is, is there some colorable nexus between the action taken that Michelle was alleged to have taken, signing the affidavit, and the ongoing action? Judge Brand found, as he could only have found, is that the amended complaint is replete with instances where Plaintiff Parks Miller is saying, each defendant committed an overt act done in pursuit of a common purpose. What was that common purpose? To prosecute Stacey Parks Miller. Well, there could have been other purposes, too, though, right? The purpose, there could have been 27 other purposes. The purposes alleged in the complaint before this Court is a common act to prosecute, to be involved in a prosecution. But there were other allegations, namely that Schutt breached fiduciary duty by stealing information and giving it to a majority, right? Right, and that's different from- I mean, how can that claim be thrown out? I mean, what difference does it make that the email included 11 people? I mean, I don't understand the logic in that. Okay, so it was said it's confidential for your eyes only. Well, confidential doesn't turn it into breach of fiduciary duty. Every single email that I sent out has confidential information on it. It doesn't turn it into that. Michelle was an employee of the county, and the county has not sued Michelle Schutt for breach of any fiduciary duty. She didn't know any fiduciary duty to the district attorney? She doesn't have a fiduciary duty. She's an employee. A fiduciary duty, according to Pennsylvania law, requires that there be essentially a position of power. And Michelle Schutt was a paralegal. She wasn't Parks Miller's boss. She doesn't meet the definitions for breach of fiduciary duty. Now, Judge Brand didn't go into that because he simply dismissed the issues, and that was all argued in the brace. But if this court looks at my- I mean, it seems to me that to get to the grant of judicial privilege, you have to assume a lot of facts which you acknowledge the court didn't go into because it was at the immunity stage as opposed to any merit stage. I mean, there's so many hoops you have to get through here to say, well, Schutt didn't do anything wrong, it was in connection with the common purpose, a colorful connection to the common purpose. But I have a little bit of trouble grasping what that common purpose was. You know, all of a sudden, 15 months after this fake bail order and two jobs later, she shows up in the offices of one of the DA's arch enemies and spills the beans on something that certainly was a bit incendiary, at least politically, throughout your county. Your Honor, may I answer that question? You may. And Judge Brand simply addressed that. I mean, we are here in a 12B6 motion. All we can do is say these are the facts that the plaintiff has pled. Right. The plaintiff has pled in 387 paragraphs of the complaint that there was a common purpose to illegally prosecute her and that this affidavit initiated the prosecution, which it did. Six days later, it was used for the search warrant. So that the judge, Judge Brand said, it is disingenuous for Parks Miller to say there was no intent when that's the basis of every claim except for the email claim. So you can't say there's no immunity if you're saying the actions were all taken to prosecute and testify against someone. Yeah, but I guess if I can, I have another red light. I guess the problem I have in thinking about this, I see the argument that the first time she really disseminates, at least the first time that the record shows that she disseminates any information about this bail order, is when she's working for Masorti and she's signing this affidavit. But a period of time ensued in between in which she clearly carried the text of that affidavit out of the office and put it into her own Gmail account. And she did it for some purpose, which has to be a breach of something. And they're arguing it's a breach of fiduciary duty. If it's not a breach of fiduciary duty, it's a breach of some duty that you owe to your superior. And I guess the question seems to me, do you get judicial privilege for having carried that for 15 months and being in a position then to disseminate it? I think that goes beyond what Shane Viadis called judicial privilege, even though it's a markedly different factual situation. Well, if I may respond, I think Judge Hardman made this point. We don't look at false testimonies protected. I mean, testimony can be outright false. It can be outright a lie. And it's protected because the whole idea is that we want to allow people to participate in the judicial process. And we don't look to, okay, I mean, it may be another cause of action which was not planned that you're thinking. That's in the judicial process. We're not talking about a judge here. We're talking about a paralegal who is alleged to have stolen her boss's information in order to parlay that into a job with a lawyer who was known to be adverse to her boss. Isn't that the claim? The claim is that she used this information for an illegal prosecution. Well, later, sure. But that's the only act. The affidavit is the only act that's part of this complaint. I mean, the history is. The complaint didn't plead that she stole information that belonged to the DA in order to try to get a job? No, it does that. But the action at issue that is used, two actions. She signed an affidavit in order to illegally prosecute. Well, that came later, right? No. She didn't steal the e-mails, allegedly, first? Well, she worked for the district attorney 15 months before this. So the allegation is that she used these e-mails to please her boss to illegally prosecute the plaintiff. Well, but there was a period in which she had taken the e-mails that she had no business having and had kept them with some plan in mind. Now, having these e-mails in her possession, wasn't that a breach of a fiduciary duty that an employee owes to an employer? I believe it does not meet the fiduciary duty issues. In order in Pennsylvania to breach a fiduciary duty, you have to be in a position of you have to be someone's boss or you have to meet the elements of that, and it doesn't meet the elements of that. But we don't, I guess, but the district court never addressed that, did it? What it addressed is saying that this could not possibly have been a breach of fiduciary duty because it was sent to 11 people. Okay.  All right, thank you, Ms. Jurczyk. Mr. Cohn? May it please the Court, Jacob Cohn for Attorneys Andrew Shubin and Sean McGraw. I realize that I only have two minutes here, and they're sort of the drag-along defendants, as I refer to them, and drag-along appellees. And unless the Court has any specific questions with respect to them, we're happy to rest on our brief and our Rule 38 motion. Thank you, Mr. Cohn. Thank you, Your Honor. Mr. Hinton? Good afternoon, Your Honors. Tim Hinton, I represent Bernard Cantuorna, and I likewise have two minutes left in the argument here today. I would like to rest on my brief for most of my arguments. I do want to address the defamation claim because I think that's the most serious claim that's alleged against Bernard Cantuorna. And whether a statement is capable of defamatory meaning or not is a legal issue for the Court to address. We think Judge Moran addressed that properly. And thankfully, we have a black-and-white transcript of Mr. Cantuorna's statement at the Commissioner's meeting on January 20, 2015. He repeatedly says in his public comment to the Commissioners asking for a special prosecutor to investigate District Attorney Parks Miller that these are allegations. He doesn't adopt them as true statements. By this point in time, on January 20th... I thought you were going to say that is a true statement. Because to say something is an allegation presupposes that what follows the allegation is not yet proven true. And that's the position Mr. Cantuorna took on January 20th. He thought there were serious allegations. By that point in time... And how do we know that it was true that there were allegations? What can you point to in the record to show that was a true statement? Well, there's admissions in Stacey Parks Miller's pleading that by that point in time, Michelle Schotter, Philip Massorti had gone to the Belafonte Police Department to make a report. The affidavit had been circulated. In fact, one of the television stations a week before January 20th was on this story. There were things occurring at the courthouse. There were some protests. This was well-known in the community. I don't think there's any dispute as to that fact. Mr. Cantuorna, Mr. Shuman, they appeared at the county commissioner's office. They asked for an investigation. Whether they're right or wrong as to whether the Commonwealth Attorneys Act was the proper procedure to pursue that investigation or not, the defamatory statement is by asking for an investigation, you're saying I'm a criminal. All Cantuorna was doing was asking for an investigation. It's something that DA Stacey Parks Miller did herself. She just went to the Office of the Attorney General for that investigation. We don't think that the statements, and we can look at them in black and white, are capable of defamatory meaning. Additionally, there's a legislative immunity, which I cited to in my brief, that would apply to his statements. With that said, I would rest, unless there's any questions. Thank you, Mr. Hinton. Ms. Van Horn? Good afternoon, Your Honors. I'm Stephanie Van Horn on behalf of Attorney Mizzorti. I likewise would rest on my brief, but would be happy to answer any questions. Well, I have a question because I'm troubled by this allegation that Ms. Schutt acted in concert with Attorney Mizzorti to take what wasn't hers from her employer in the county and give that to Mr. Mizzorti. Why is that not an allegation? Why shouldn't at least the breach of fiduciary duty allegation, the concerted tortious conduct allegation, and the conspiracy allegation, why shouldn't those three at least go forward to discovery? Well, with regard to the time that Ms. Schutt took the e-mails or allegedly stole them, she didn't know Attorney Mizzorti at that point, so there's no way he was involved in that. Well, they've alleged otherwise, haven't they? They've alleged concerted action between the two. Not with regard to taking the e-mails in the first instance. I don't believe there was anything pled for Attorney Mizzorti in that regard. So what concerted action did they allege with regard to Attorney Mizzorti? I believe they're saying that he encouraged her to report it to the police or release that information. Release what information? The e-mails and the affidavit that she executed. Well, how could he give that advice to her if he wasn't privy to what the e-mails said? So I believe that there's two separate instances that they're talking about. One, they're saying Ms. Schutt breached her fiduciary duty by taking the e-mails in the first place, and then the second time was when she disclosed them to Attorney Mizzorti. Let's suppose that by accident these e-mails got sent to Mr. Mizzorti's e-mail account, and 15 months later he happens to open them up and sees that they were sent to him by mistake. What's his obligation? I don't believe that he has to send them back. He may have to notify her under the professional conduct. I believe that that applies. He's supposed to notify the sender that he got them by accident. How is that any different than all of a sudden Ms. Schutt showing up in his office as a paralegal and out of the clear blue telling him, boy, I have the goods on Ms. Parks Miller. In fact, not only can I tell you what happened, but I have these e-mails. Does he have an obligation? Wait a minute, Ms. Schutt. I don't want to see those e-mails. You took them from the office of the district attorney. I'm not getting involved in that. I don't believe he has an obligation to say that. I believe the rule applies when it's an opposing party in a case. Has there been any disciplinary matter started as a result of this involving your client? There's so many cases flying around here, I can't remember whether that's part of the record or not. I don't believe anything was filed against him. That's possible. It's probably confidential, so I wouldn't know about it. I'm not suggesting it should. I'm just asking if it was. I do not know that. I'm sorry. Okay. But why doesn't he have some obligation as opposed to saying, hey, why don't you go see my friend McGraw? He'll represent you on this, and you ought to move forward. I believe that the rule doesn't apply in this particular instance. It deals with when something is inadvertently disclosed to an opposing party, and I also don't believe that the rule requires you to send it back. So the rule has less teeth when someone does it intentionally than when it's an inadvertent disclosure? I think the title of the rule involves inadvertent disclosure. So maybe that's because if it's intentional, it's a matter for the civil or criminal justice system, not for the professional conduct. Perhaps, and I don't believe her claim is based on the rules of professional conduct. Okay. So if she doesn't have judicial privilege on the claim against her, Ms. Shutt, what does that mean for your client, Mr. Missouri? I don't believe it's of much consequence because I don't believe there was a breach of fiduciary duty because any duty that Ms. Shutt has would be to the county. She was the county's employee, not Ms. Parks Miller's employee. Wasn't there a claim of aiding and abetting? If there was no breach of fiduciary duty because Ms. Shutt didn't have a duty to Ms. Parks Miller, then there was nothing for him to aid and abet. Okay. Okay, thank you, Ms. Van Horn. We'll hear Mr. Castro on rebuttal. Thank you, Your Honor. I wish I had saved 20 minutes for rebuttal. A couple of quick things. First of all, Michelle Shutt works for the district attorney in a confidential capacity and signed as part of her agreement, nondisclosure agreement with the district attorney's office. That's a record. So clearly she's in a fiduciary capacity. One thing I'd like the court to consider is the notion that everything that the grand jury found as a fact, at the very least, if it is contrary to what the defense is arguing, at the very least that becomes a fact issue for discovery. The district attorney was found actually innocent by the grand jury and a whole series of things, not the least of which is that, one, McGraw went to see. I'm not so sure that that's an accurate statement. One, we're not talking about actually innocent as we hear it in this court generally, but it seems to me that what the grand jury did was they chose not to file any charges against your client. Oh, I don't agree at all, Judge Fischer. They specifically said that Judge West signed it. They found that as a fact. Right. Secondly, they found it was impossible for the DA to have had criminal intent even if she had signed it. I mean, it wasn't a jury discretion here. These were specific facts. They made a minor finding on the finance issue. I mean, it was a couple hundred dollars. Counsel mischaracterizes that. The district attorney, as Judge Fischer pointed out, was unopposed. One of her assistants was running for MDJ and asked for a printout of the dates when things needed to be filed and notarized something. Those are things that the DA's office gave to every human being who walked in the door for free. And the county, Mr. Glantz, had reviewed that more than a year before and determined that it was de minimis and not worth considering. Did you plead the report of the grand jury as part of your complaint? Absolutely. Quoted it at length. Okay. I want to make sure I understand what you're saying. You're saying that the report of the grand jury created a question of fact on some of these key questions, particularly the signature itself? No. I am saying that the grand jury didn't create any questions of fact, but in the light most favorable to the defense and this proceeding, it should mean if there's anything at odds with what the grand jury found and what the defense is arguing, that's a question of fact to be fleshed out and discovered. And we could be arguing about this in summary judgment somewhere. But when the grand jury finds as an actual fact that Judge West signed her name and find as an actual fact that it was impossible for there to be a mens rea proportion. Actually, what they found was it was her signature. No, he actually said that it was her signature. They said it was her signature. They said it was her signature, yes. And if you look at the two of them, you know, it's easy to tell they're signed by the same person. You can lift the signature. I say again? No, you can lift the signature and put it on a document. That doesn't mean that somebody signed her name. Let's understand that Michelle Schutt testified she visually saw the district attorney sign it. So when the grand jury rules that Judge West signed it, they necessarily ruled that Michelle Schutt lied to them. A couple of other quick things. The ‑‑ I keep going back to this being at the motion to dismiss stage. And in a decision, Commonwealth XRL Customs Fraud Investigations versus Vitalik, a 2016 opinion of this court, Judge Roth recognized that in the context of a typical 12B6 motion, a plaintiff is unlikely to know whether his complaint is actually deficient and in need of revision until after the district court has ruled. Rarely has this court upheld a dismissal with prejudice of a complaint when the plaintiff has been given no opportunity to amend. And we did not have benefit of Judge Brand's opinions, have an opportunity to replete except for one small area as it related to the county commissioners. And as it relates to the use of privileges and immunities, those are defenses that can be raised unless it's absolutely clear. And when somebody argues that there's some legislative privilege for the commissioners, all of these things have to be in the context of their employment. And commissioners' employment is never to investigate and prosecute criminals. The grand jury found that they not only should have stopped when the attorney general became involved, but they even applied the statutes that they said they were using wrongly. And I think it's of enormous consequence that the man who stood up and brought the world to this revelation, Mr. Cantorna, is now the district attorney elect for all intents and purposes. And I disagree with counsel. It did not become public knowledge until January 20th when Mr. Cantorna, Mr. Shuman, and Mr. Graw stood up in that meeting and said all of these things to a body that could not, as a matter of law, engage in a criminal investigation or a criminal prosecution. In the light most favorable to the defense here, I think that this is a serious matter. You mean the plaintiff? No. In the light most favorable to the defense. I'm sorry. I did mean that. This is a serious matter. I thought we used to accept all your allegations as true. You do. And I wish Judge Brand had done that. But the, excuse me, I was, in the light most favorable to the defense, we should have been given an opportunity to replete. And if you look at Judge Brand's opinions, they are replete with statements, there is no evidence that, there is no evidence this. That's not what we're doing at the 12B6. We understand the rule. If there's one thing we understand, it's the distinction between Rule 12 and Rule 56. And I can't understand why Judge Brand didn't agree with that. And I can't understand why he didn't adopt Judge Ross' opinion that we should be allowed to replete. This is serious business. And the other side has said that all of this was designed to get a prosecution of the DA. Absolutely not. What we pled was all of these things were designed to ruin her career in the court of public opinion, in all spheres, because it didn't need to be true. It didn't need to result in a conviction. All they needed to do was have little cut, little cut, little cut, newspaper article, newspaper article, newspaper article, abuse of process by filing these things that had nothing to do with motions. And in fact, it worked. All right. Thank you, Mr. Castor. The court wants to thank all counsel for the excellent argument.